UNITED STATES of America, Appellee,

v.

John MAPP and Kevin Moore,
Defendants–Appellants.

Docket Nos. 97–1342, 97–1344.

United States Court of Appeals,
Second Circuit.

Argued Aug. 10, 1998.

Decided March 16, 1999.

**330**

George Sheinberg, Brooklyn, NY, for Appellant John Mapp.

Bobbi C. Sternheim, New York, NY, for Appellant Kevin Moore.

Lisa J. Klem, Assistant United States Attorney for the Eastern District of New York (Zachary W. Carter, United States Attorney,

David C. James, Assistant United States Attorney, of counsel), for Appellee.

Before: CALABRESI, CABRANES, and STRAUB, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

John Mapp and Kevin Moore appeal from judgments entered following a jury trial in the United States District Court for the Eastern District of New York (Frederic Block, *Judge*), convicting them of various racketeering offenses. Mapp was convicted of one count of robbery affecting interstate commerce, in violation of 18 U.S.C. § 1951 (the "Hobbs Act");[1] one count of attempted robbery affecting interstate commerce, also in violation of the Hobbs Act; and one count of entering a bank with intent to commit a felony, in violation of 18 U.S.C. § 2113(a) and (d).[2] Moore was convicted of one count of conspiracy to commit robbery affecting interstate commerce, in violation of the Hobbs Act; and one count of murder in aid of racketeering, in violation of 18 U.S.C. § 1959.[3] The district court sentenced Mapp principally to a 450–month term of imprisonment and a five-year term of supervised release. It sentenced Moore principally to life imprisonment and a three-year term of supervised release.

 On appeal, Mapp and Moore raise various challenges to their convictions and sentences. Mapp contends that the evidence at trial was insufficient to support his offenses of conviction, because the government failed to prove the jurisdictional requirement of the Hobbs Act.[4] He also argues that the

---

**1.** 18 U.S.C. § 1951(a) provides in pertinent part that "[w]hoever in any way or degree obstructs, delays, or affects commerce ... by robbery or ... attempts or conspires so to do ... shall be fined ... or imprisoned not more than twenty years, or both."

**2.** 18 U.S.C. § 2113(a) provides in pertinent part that "[w]hoever enters ... any bank ... with intent to commit in such bank ... any felony affecting such bank ... and in violation of any statute of the United States ... [s]hall be fined ... or imprisoned not more than twenty years, or both."
18 U.S.C. § 2113(d) provides in pertinent part that "[w]hoever, in committing ... any offense defined in subsection[ ](a) ... assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall

be fined ... or imprisoned not more than twenty-five years, or both."

**3.** The provisions of 18 U.S.C. § 1959 relevant to this appeal are set forth in the text of this opinion, *infra*.

**4.** As we discuss below, the trial evidence showed that each of Mapp's offenses of conviction involved the robbery or attempted robbery of proceeds of businesses that engaged in interstate commerce by selling goods that the businesses had themselves acquired from sources outside the State of New York. Accordingly, we conclude that Mapp's challenge to the sufficiency of the evidence lacks merit and warrants no further discussion. *See United States v. Taylor*, 92 F.3d 1313, 1333 (2d Cir.1996) (Hobbs Act jurisdictional requirement satisfied by proof that defendant's

district court erred by sentencing him as a career offender pursuant to U.S.S.G. § 4B1.1 and by departing upward from the sentencing range prescribed by the United States Sentencing Guidelines (the "Guidelines"). Moore claims that he was prejudiced by the admission at trial of statements elicited from him in violation of his Sixth Amendment right to counsel; that he was improperly convicted under 18 U.S.C. § 1959 for an unintentional killing; that the evidence was otherwise insufficient to sustain his conviction under that statute; that his Fifth Amendment right to due process was violated by the district court's giving of a supplemental jury instruction; and that he was unfairly prejudiced by statements made by the prosecution in summation. In addition, Moore claims that the district court erred by failing to grant him a downward departure from the sentence range prescribed by the Guidelines.[5] For the reasons given below, we affirm the judgments of conviction in their entirety.

## I.

We describe below the trial evidence, which we are required to view in the light most favorable to the government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Frank*, 156 F.3d 332, 334 (2d Cir.1998).

Mapp and Moore were members of a robbery gang based in Brooklyn, New York. The gang had a fairly distinct hierarchy and division of roles. Its leaders were primarily responsible for selecting potential victims, for planning robberies, and for providing guns and cars as necessary; lower-level members of the gang were responsible for physically carrying out the robberies. The gang typically targeted bank patrons as they waited in line to deposit business proceeds in various banks throughout Brooklyn, Manhattan, Queens, and the Bronx. Gang members were usually armed when they committed the robberies, and they understood that it was acceptable to shoot and kill a victim if a large amount of money was at stake. Mapp was a leader of the gang, while Moore was a lower-level gunman.

At trial, the government introduced evidence of five of the gang's robberies, all of which included John Mapp as a participant. For example, on December 12, 1990, Mapp himself robbed Gerald Diamond, an employee of Flatbush Comics and Books, as Diamond was about to deposit approximately $7,000 worth of business proceeds at a bank in Brooklyn. Diamond testified at trial that his store sold comic books and videos that it had purchased from sources in Illinois and New Jersey. Similarly, on July 15, 1991, the gang attempted to rob Marie Blumden as she stood in line inside a bank in Queens, waiting to deposit approximately $8,000 in proceeds from Swif's Discount Center, a business owned by her husband. Blumden testified that Swif's sold goods that it had purchased from sources in Minnesota and South Carolina. During this robbery, Mapp acted as a driver and look-out man. Like the robbery and the attempted robbery just described, the remaining three robberies for which the government offered evidence each took place at a bank and resulted in the theft of proceeds from a business engaged in interstate commerce. Unlike the Flatbush Comics and Swif's Discount robberies, however, the remaining robberies each involved the shooting of a non-participant by a gang member.[6]

Only one of the robberies described at trial—a robbery that resulted in the murder of Theodore Severides—implicated Moore. Because of its significance to this case, we

---

criminal activity depleted the assets of businesses engaged in interstate commerce); *see also United States v. Farrish* 122 F.3d 146, 149 (2d Cir.1997) (reaffirming, after *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), that Hobbs Act jurisdictional element satisfied by showing of minimal effect on interstate commerce).

**5.** Unless it can be shown that a sentencing court based its decision not to grant a downward de-

parture on a misunderstanding of its authority to depart, such a decision is unreviewable on appeal. *See United States v. Matthews*, 106 F.3d 1092, 1095 (2d Cir.1997). Because Moore has shown no such defect in the district court's exercise of its discretion here, we dismiss this claim without further discussion.

**6.** Mapp himself was not the shooter in any of these incidents.

must describe the Severides robbery and murder in some detail.

To prove the events surrounding the Severides murder, the government relied primarily on the testimony of Leon Sainsbury, a member of the gang who became a cooperating witness after pleading guilty to federal robbery and firearm charges in September 1995. Sainsbury testified that, on the morning of November 18, 1991, he gathered with Moore, Mapp, and other gang members at the home of gang leader Darrell Fulton to plan a robbery. At the end of the meeting, Mapp drove Moore, Sainsbury, and Fulton to a branch of the Chemical Bank in Manhattan. Once there, Fulton entered the bank and began looking for the robbery target who had been designated at the morning's planning session. When that person failed to appear, Fulton picked Severides as an alternative victim. At the time that Fulton noticed him, Severides was standing in line with a bag under his arm, waiting to deposit cash proceeds from his business, the Joy II Delicatessen. Having selected Severides as a target, Fulton exited the bank and informed Moore and Sainsbury of his choice.

After receiving their instructions from Fulton, Moore and Sainsbury entered the bank and approached Severides, who was still waiting to make his deposit. Moore walked directly behind Severides and grabbed the bag Severides was holding under his arm. As Moore did so, Severides turned and reached towards him. Moore then shot and killed Severides.

After the shooting, Moore and Sainsbury ran out of the bank and eventually reunited with the other gang members at Fulton's house. Sainsbury testified that Fulton expressed anger at the fact that Moore had shot Severides. Moore responded by saying that he had not intended to shoot Severides, but that "if we kept going out that was going to happen eventually." Before leaving Fulton's house that day, the gang members divided up the money they had stolen from Severides, with Mapp and Moore each taking a share.

Mapp and Moore were subsequently named as co-defendants in a thirteen-count superseding indictment filed on April 26, 1996. The indictment alleged that, for at least the period between December 1990 and December 31, 1991, Mapp and Moore were members of a criminal organization that affected interstate commerce through, among other things, the robbery of businesses that engaged in such commerce. Mapp was named in all thirteen counts of the indictment. Counts 1, 4, 6, and 10 charged him with robbery affecting interstate commerce, in violation of the Hobbs Act; Count 2 charged him with attempted robbery, in violation of the Hobbs Act; Count 9 charged him with conspiracy to commit robbery, in violation of the Hobbs Act; Count 3 charged him with attempted robbery affecting a bank, in violation of 18 U.S.C. § 2113(a) and (d); Counts 7 and 11 charged him with entering a bank with the intent to commit a felony, also in violation of 18 U.S.C. § 2113(a) and (d); Counts 5, 8, and 13 charged him with the use of a firearm, in violation of 18 U.S.C. § 924(c); and Count 12 charged him with murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). Moore was named as a co-defendant with Mapp in Count 9, for conspiracy to commit robbery, in violation of the Hobbs Act; in Count 10, for robbery, in violation of the Hobbs Act; in Count 11, for entering a bank with the intent to commit a felony; in Count 12, for murder in aid of racketeering; and in Count 13, for a firearm violation. All of the charges filed against Moore grew out of his involvement in the Severides murder. With the exception of Count 9, all the counts of the indictment charged each named defendant both as a principal and as an aider and abettor, pursuant to 18 U.S.C. § 2.[7]

■ At the close of the evidence in the jury trial, the district court dismissed Counts 10 and 11 of the indictment (each of which named both Mapp and Moore) for lack of venue.[8] The jury found Mapp guilty on one

---

7. 18 U.S.C. § 2(a) provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

8. As indicated above, Counts 10 and 11 charged Mapp and Moore with violations of 18 U.S.C. § 1951 and 18 U.S.C. § 2113, respectively. Both counts were based on the Severides robbery.

count of Hobbs Act robbery (Count 1), one count of attempted Hobbs Act robbery (Count 2), and one count of attempted robbery affecting a bank, in violation of 18 U.S.C. § 2113(a) and (d) (Count 3), but was unable to reach a verdict with regard to the remaining counts as they pertained to him. Moore was found guilty of one count of conspiracy to commit Hobbs Act robbery (renumbered Count 9) and one count of murder in aid of racketeering (renumbered Count 10), but the jury did not reach a verdict as to the remaining firearm charge. After a sentencing hearing,[9] the district court entered judgments of conviction against Mapp and Moore, and their timely appeals followed.

## II.

We first address Moore's contention that the district court improperly admitted a tape recording of a conversation between him and Sainsbury that occurred on October 24, 1995, after Sainsbury had become a cooperating witness for the government. The following additional background information is necessary for a full understanding of this claim.

Moore was indicted in December 1991 on state gun charges unrelated to this case. He eventually pled guilty to those charges and began serving a multi-year prison sentence. Shortly thereafter, he was also charged in state court with the Severides murder. However, in June 1995 that charge was dismissed at the state's request, due to evidentiary and speedy trial problems. In October 1995, while Moore was still serving his sentence for the state gun conviction, federal prosecutors obtained a writ from Judge Block authorizing United States Marshals to bring Moore to the Eastern District of New York courthouse. In their initial application for the writ, the prosecutors represented to the court that they wanted to bring Moore to the Eastern District in order to take his fingerprints. Later, in a letter dated October 24, 1995, they informed the court that they also wanted to place Moore in a holding cell with Sainsbury, in the hope that the latter would be able to elicit statements about Moore's role in the Severides murder.

The meeting between Moore and Sainsbury took place on October 24, 1995, the same day that the government wrote its letter to Judge Block. The transcript of their conversation is largely incomprehensible, but Moore did make certain statements that suggest his connection to the robbery gang. For example, Moore referred to several gang members, including Mapp, by name. He also suggested that he and Sainsbury had committed crimes together in Brooklyn and in Manhattan, the latter being a possible reference to the Severides murder. Several months later, in April 1996, Moore was indicted on the federal charges that led to the conviction presently under review.

At trial, the government sought to introduce a tape recording of the Moore–Sainsbury conversation as evidence of Moore's membership in the robbery gang and his responsibility for the Severides murder. Moore made a timely objection before the district court. As he does now, Moore argued that, in arranging for the meeting with Sainsbury, the state and federal authorities had improperly colluded to deprive him of his Sixth Amendment right to counsel. This claim lacks merit.

---

The district court dismissed these counts for lack of venue because they charged discrete, substantive crimes that occurred in Manhattan, which is outside the Eastern District of New York. However, the district court denied a request by Mapp and Moore that it also dismiss Count 12, which alleged a violation of 18 U.S.C. § 1959. The court's reasoning was that the charge in Count 12 was based on a murder committed in furtherance of a Brooklyn-based racketeering enterprise. In a footnote of his appeal brief, Moore argues that the district court's refusal to dismiss Count 12 for lack of venue was in error. This claim is not properly preserved for review on appeal. *See United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir.1993) (argument raised only in a footnote not adequately raised or preserved for appellate review). The placement of this issue in a footnote (only) leads us to decline to consider Moore's claim here.

**9.** The district court initially intended to conduct a hearing for the presentation of evidence regarding the government's request that the court depart upward in sentencing Mapp. However, because the government ultimately asked the court to base its upward departure decision solely on conduct as to which evidence was presented at trial, a hearing was unnecessary.

The Sixth Amendment right to counsel does not attach until "a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (quoting *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984)). Moreover, the right is offense-specific. *See id.* In other words, the Sixth Amendment does not prohibit the questioning of an individual regarding other crimes, as to which the right has not yet attached. *See Maine v. Moulton*, 474 U.S. 159, 178–80, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). Since the federal prosecution of Moore was not commenced until the federal indictment was handed down, some six months after his conversation with Sainsbury, Moore's right to counsel in defending against those charges had not yet attached at the time of the conversation. Nonetheless, Moore contends that, because federal and state law enforcement officials "created a seamless web of incarceration and prosecution," the right to counsel that attached upon the filing of the *state* charges against him for the Severides murder survived the dismissal of those charges in June 1995 and prevented questioning by Sainsbury outside the presence of counsel.[10]

In support of this argument, Moore relies on the decision in *United States v. Martinez*, 972 F.2d 1100 (9th Cir.1992). Like Moore, the defendant in *Martinez* was indicted on a federal charge for conduct that had also been the subject of a previously-dismissed state court indictment. Also like Moore, Martinez was questioned by federal authorities in the period between the dismissal of the state charge and the filing of the federal charge. In attempting to suppress the statements he had made to the federal investigators, Martinez argued that "once a defendant has been charged, he may not thereafter be interrogated about the subject matter of those charges unless his counsel is present," even after the charges have been dismissed. *Id.* at 1104. The *Martinez* court did not accept that argu-

ment, reasoning that to do so would unjustifiably "extend the prohibition on interrogation outside the presence of counsel to any investigation of a given set of acts, even if the second investigating unit had no connection to the first." *Id.* But the court did hold that the Sixth Amendment would be violated if state and federal authorities colluded to manipulate the timing of the dismissal and filing of charges in a manner calculated to deprive an individual of his right to counsel. *See id.* at 1105–06.

We need not decide now whether to adopt such a rule. Even if we were to conclude that the Ninth Circuit's rule is correct, Moore has failed to establish any impropriety in his questioning by Sainsbury. Before it permitted the admission of the tape recording at trial, the district court conducted a thorough hearing on the extent of federal and state collaboration in the dismissal of the state case against Moore and the initiation of the federal one. At the end of the hearing, having heard the live testimony of five of the state and federal officials involved in prosecuting Moore, the district court made the following findings of fact: that the federal and state investigations were conducted independently; that there was no federal involvement in the decision to dismiss the state charges against Moore; and that there was no state involvement in the federal authorities' decision to interrogate or charge Moore. Based on these findings, the district court determined that there was no improper collusion between the federal and state authorities. Moore has failed to bring to our attention any information that would lead us to question the district court's conclusion. In the circumstances presented, there was no violation of Moore's Sixth Amendment right to counsel, and the tape recording was therefore properly admitted.

### III.

We turn next to Moore's various challenges to his conviction for the murder of Theodore Severides, in violation of 18 U.S.C.

---

**10.** It is undisputed that Sainsbury acted as a government agent during his conversation with

Moore. *See Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

§ 1959. That statute provides, in pertinent part, that

[w]hoever, as consideration for the receipt of ... anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders ... any individual in violation of the laws of any State or the United States ... shall be punished ... by death or life imprisonment[.]

18 U.S.C. § 1959(a)(1). Section 1959 defines an "enterprise" to include "any union or group of individuals associated in fact ... the activities of which affect interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). Moreover, the statute adopts the definition of "racketeering activity" set forth in the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961. We have previously noted that Congress intended section 1959 to complement RICO. *See United States v. Concepcion*, 983 F.2d 369, 380 (2d Cir.1992). And we have inferred that, like RICO, section 1959 is to be construed liberally in order to effectuate its remedial purposes. *See id.* at 381.

As the predicate for its prosecution of Moore under section 1959, the government contended that Moore murdered Severides in violation of New York Penal Law § 125.25(3), New York's felony murder statute. Section 125.25(3) provides, in pertinent part, that a person is guilty of second degree murder when

[a]cting either alone or with one or more other persons, he commits or attempts to commit robbery ... and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants[.]

The district court instructed the jury that it could find Moore guilty of having violated section 1959 if it concluded, *inter alia*, that (i) Moore had murdered Severides in violation of § 125.25(3), and (ii) that he had done so either as consideration for a promise to pay anything of pecuniary value from the racketeering enterprise charged in the indictment or for the purpose of maintaining his position in that racketeering enterprise. The district court further instructed the jury that, under section 125.25(3), it does not matter if the act which caused death was committed unintentionally or accidentally.

Moore principally challenges his conviction on the ground that the government failed to establish section 1959's motivation or purpose element. Specifically, Moore argues that one cannot have a motivation or purpose for committing an unintentional act, and that, accordingly, section 1959 should be interpreted as punishing only intentional murders.[11] Moore further asserts that the trial evidence at most proved that he killed Severides accidentally during a robbery and that he was thus improperly found guilty of violating section 1959. In response, the government does not claim that it proved at trial that Moore murdered Severides intentionally. It does, however, dispute Moore's interpretation of the statute.

█ We do not believe that section 1959 reaches only murders that were committed intentionally. Instead, it is sufficient for the government to prove that the defendant committed murder—however that crime is defined by the underlying state or federal law—and that he engaged in the *conduct* that resulted in murder, however defined, with the purpose or motivation prescribed in the statute. In this case, New York's felony murder law mandates that an individual is guilty of second-degree murder if he participates in a robbery that results in the death of a non-participant. Thus, it was sufficient for the government to prove that the perpetrator participated in such a robbery with the expectation of receiving in return something of value from the charged racketeering en-

---

**11.** Without objection from the government, Moore has styled this challenge as based on the sufficiency of the evidence. To the extent that Moore's argument is more accurately considered a challenge to the district court's jury instruc-

tions, we believe the claim is preserved for appeal, since Moore raised the issue of the proper interpretation of section 1959's motivation requirement before the district court.

terprise, or in order to maintain his position in that enterprise.

This interpretation is consistent with both the text and the purpose of section 1959. It is consistent with the text because section 1959, without qualification, leaves to state law the definition of the predicate acts of murder. As to the legislative purpose, it is evident that Congress enacted section 1959 in view of the "Federal Government's strong interest . . . in suppressing the activities of organized criminal enterprises." S. REP. No. 98–225, at 305 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3484. To vindicate that interest, Congress sought to "proscribe[ ] murder and other violent crimes committed . . . as an integral aspect of membership in a" racketeering enterprise. *Id.* at 304. In our view, the federal interest is just as strong in punishing violent acts (like armed robbery) that result in death as it is in punishing intentional killing. Moreover, because our interpretation of the statute preserves the requirement that any predicate murder, whether intentional or not, bear a strong relationship to racketeering activity that affects interstate commerce, it does not risk improperly making purely local crimes a matter of federal concern.

■ With this construction of section 1959 in mind, we have no trouble concluding that the evidence offered at trial was sufficient to sustain Moore's conviction. Preliminarily, we recall that, in assessing a challenge to the sufficiency of the evidence, "we must consider the evidence in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government, and [we] may overturn the conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998) (internal quotation marks omitted).

Moore's claim that there was insufficient evidence to prove that he participated in the robbery and murder of Severides plainly lacks merit. The jury could have credited Sainsbury's testimony that it was Moore himself who shot and killed Severides. Similarly, there was also sufficient evidence from which the jury could have found that the government established section 1959's motivation or purpose element. We have previously held that the motive requirement is satisfied if the jury could infer from the evidence that "the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Concepcion,* 983 F.2d 369, 381 (2d Cir.1992). Here, Sainsbury testified that Moore was a member of the robbery gang and that he was specifically instructed by a gang leader to rob Severides. There was also evidence that gang members were expected to shoot robbery victims if necessary and that a willingness to do so was a prerequisite for membership in the gang. On the basis of this evidence, the jury could infer that Moore participated in the robbery and murder of Severides with the purpose of furthering his position in the robbery gang.

■ With regard to Moore's final sufficiency-based challenge to his section 1959 conviction, we conclude that a rational jury could readily have found that the enterprise charged in the indictment affected interstate commerce.[12] The government offered evidence of five robberies, all of which involved the theft or attempted theft of the proceeds of a business that engaged in interstate commerce by selling goods that had been obtained from out of state. This was clearly sufficient evidence to establish the jurisdictional requirement of section 1959. *See United States v. Taylor,* 92 F.3d 1313, 1333 (2d Cir.1996) (Hobbs Act jurisdictional requirement satisfied by proof that defendant's criminal activity depleted the assets of businesses engaged in interstate commerce).[13]

12. Moore does not appear to contest that the robbery gang was an enterprise as defined by 18 U.S.C. § 1959(b)(2).

13. Moore's claim that the government failed to establish the jurisdictional requirement for his conviction for conspiracy in violation of the Hobbs Act is also meritless. The government introduced evidence at trial that Severides's business, the Joy II Delicatessen, sold goods that had been manufactured in Colorado, Wisconsin, and Holland.

■ Moore also claims that the district court violated his Fifth Amendment right to due process of law by giving the jury a supplemental jury instruction on New York's felony murder statute, New York Penal Law § 125.25(3). After it had begun deliberating, the jury sent the district court a note that asked whether Moore could be found guilty of violating section 1959 if he did not at any time either carry or use the gun involved in the Severides murder. After hearing argument from the parties, the court responded to the jury, first, by reminding it of the initial charge on the elements of section 1959, including the requirement that the government prove that Moore murdered Severides in violation of N.Y. Penal Law § 125.25(3). The court then supplemented its original instruction by informing the jury that it could find Moore guilty of violating that statute if it found that, during the course of a robbery in which Moore was a participant, Moore *or another participant* in the robbery caused Severides's death. Before giving its supplemental instruction, the court gave Moore the opportunity to offer additional argument and/or evidence to the jury. Moore declined.

In these circumstances, we believe that Moore's challenge to the district court's decision to give this supplemental jury instruction lacks merit. Notably, Moore does not claim that the supplemental jury instruction deviated from the charges contained in the indictment. Nor does he maintain that there was any legal error in the content of the instruction. Instead, Moore argues only that the instruction "changed the government's theory of liability" on the section 1959 charge and that he might have asserted additional defenses at trial if he had known that such an instruction would be given. But this contention is unpersuasive because, even now, Moore is silent as to what those defenses might be. Finally, by giving him the opportunity to respond by presenting additional evidence or argument to the jury, the district court carefully avoided causing Moore any arguable prejudice in the giving of the supplemental instruction.

## IV.

■ Moore also claims that certain statements made by the prosecutor in sum-mation infringed his right not to testify and impermissibly shifted the burden of proof, requiring reversal of his conviction. An improper summation will only warrant a new trial when the challenged statements are shown to have caused substantial prejudice to the defendant, *see United States v. Millar,* 79 F.3d 338, 343 (2d Cir.1996); rarely will an improper summation meet the requisite level of prejudice, *see United States v. Germosen,* 139 F.3d 120, 128 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 829, 142 L.Ed.2d 686 (1999). In determining whether substantial prejudice has occurred, we consider "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper statements." *Millar,* 79 F.3d at 343.

Moore bases his claim specifically on comments made by the prosecutor in reference to the tape of the October 24, 1995 conversation between Moore and Sainsbury. During his summation, the prosecutor replayed the tape for the jury and then offered his interpretation of the tape's contents. For example, the prosecutor asked the jury to infer Moore's membership in the gang from Moore's allusion to having committed crimes in Brooklyn with Sainsbury. The prosecutor also argued to the jury that Moore's repeated references to "Manhattan" had to do with the Severides murder and that the "burner" referred to in the conversation was the gun used to shoot Severides. At the conclusion of his description of the tape, the prosecutor said to the jury, "When ... Kevin Moore's attorney addresses you, see if she can answer what they were talking about. See if she can explain what the burner was all about. See if she can explain what Kevin Moore meant by ... 'We got to stick together' [and] '[t]his is not Manhattan.'" The prosecutor concluded this segment of his remarks by asking the jury, "Can [Moore's counsel] explain this tape? Can she explain the words of her client? Can she give us a different version of it?"

Concededly, the prosecutor's comments may have straddled the fine line between arguing that the government's case has been

largely uncontradicted and impermissibly suggesting that the defendant has an obligation to testify or that he has any burden of proof. *See United States v. Parker*, 903 F.2d 91, 98 (2d Cir.1990). Nevertheless, we believe that any prejudice arguably caused by the prosecutor's remarks was substantially eliminated by a curative instruction promptly given by the trial judge. After defense counsel's objection, and before it called upon defense counsel to offer its summation, the court specifically instructed the jury that it was to disregard the comments at issue. The court further told the jury that defense counsel was under no obligation to answer the questions asked by the prosecutor and that, should defense counsel choose not to respond, the jury was not to draw any inferences from counsel's silence. The court concluded its curative instruction by reminding the jury that "the burden never shifts on any element of any issue to a defendant." Under these circumstances, Moore is not entitled to reversal of his conviction.

## V.

Finally, we turn to Mapp's challenges to his sentence. Mapp's principal contentions are, first, that the district court improperly sentenced him as a career offender, pursuant to Section 4B1.1 of the United States Sentencing Guidelines;[14] and second, that the district court acted unreasonably by departing upward from the prescribed Guidelines range in order to impose a 450–month term of imprisonment.

■■■ Section 4B1.1 provides, in pertinent part, that a defendant qualifies as a career offender if he has at least two separate prior felony convictions for a crime of violence. *See* U.S.S.G. § 4B1.1. However, to be counted separately in applying Section

4B1.1, the defendant's prior convictions must be unrelated. *See* U.S.S.G. § 4B1.2(c). Under the Sentencing Guidelines, prior convictions are considered related if, *inter alia,* they resulted from offenses that were "consolidated for trial or sentencing." U.S.S.G. § 4A1.2, Appl. Note 3.

The district court classified Mapp as a career offender on the basis of Mapp's prior state convictions for two robberies that occurred in May 1985. Following guilty pleas to both offenses, Mapp was sentenced on the same day, November 12, 1985, by a single judge in Queens County Supreme Court to concurrent nine-year terms of imprisonment for the robberies. Mapp was indicted separately for the robberies, and he concedes that there was no formal order consolidating the two cases for sentencing. Nonetheless, he maintains that the cases were functionally consolidated for sentencing and that, accordingly, the district court should have counted them as one conviction for the purpose of the career offender calculus.

■■■ Our precedents clearly establish that we do not consider cases to have been consolidated (functionally or otherwise) for sentencing simply because a defendant received concurrent sentences that were imposed on the same day. *See United States v. Gelzer,* 50 F.3d 1133, 1143 (2d Cir.1995). Rather, under those circumstances, we will find cases to have been functionally consolidated only where "there exists a close factual relationship between the underlying convictions." *United States v. Lopez,* 961 F.2d 384, 387 (2d Cir.1992). We review a district court's finding as to whether prior convictions are factually related for clear error.[15] *See United States v. Patasnik,* 89 F.3d 63, 74 (2d Cir.1996); *Gelzer,* 50 F.3d at 1143.

---

**14.** Based on the district court's calculations, the effect of classifying Mapp as a career offender was to increase his Guidelines sentencing range from one of 110 to 137 months to a range of 262 to 327 months.

**15.** Previous panels of this Court, contrary to this panel and to the panels in *Patasnik* and *Gelzer,* have held that a district court's findings regarding the factual relatedness of prior convictions is subject to *de novo* review. *See United States v.*

*Keller,* 58 F.3d 884, 894 (2d Cir.1995); *United States v. Lopez,* 961 F.2d 384, 386 (2d Cir.1992). Because of the (obviously) fact-intensive nature of the inquiry and because a sentencing court's findings regarding factual relatedness in any given case are unlikely to establish widely-applicable principles of law, we believe that clear error review is appropriate. This opinion has been circulated to all of the active judges of this Court, none of whom objects to the disposition of this issue.

As indicated earlier, Mapp's prior convictions were for two robberies that occurred in May 1985. On May 10 of that year, Mapp and an accomplice approached an individual as he exited a Citibank branch in Long Island City and stole $1,600 at gunpoint. The following day, Mapp and a different accomplice approached several individuals as they sat in a car that was parked in a cemetery and robbed them at gunpoint. Reasoning that the two robberies occurred at separate locations and involved separate participants and separate victims, the district court found that there was not a close factual relationship between the offenses underlying Mapp's prior convictions.[16] We find no error, much less clear error, in the district court's conclusion.

Mapp also challenges the district court's decision to impose a sentence incorporating an upward departure from the prescribed Guidelines range. Having found Mapp eligible for sentencing as a career offender, the district court calculated a Guidelines range of 262 to 327 months' imprisonment. However, the court ultimately departed upward from that range and imposed a sentence of incarceration for 450 months. As the basis for its upward departure, the district court relied on conduct that had been charged in the indictment but as to which the jury was unable to reach a verdict. Specifically, the court found, by clear and convincing evidence, that Mapp had participated in three robberies for which he was not convicted. Each of those robberies—which included the Severides incident—involved the shooting of a victim, and the district court described Mapp's activity as "heinous."

Mapp challenges the district court's upward departure decision principally on three grounds: that the district court improperly relied on conduct as to which the jury was unable to reach a verdict; that the district court did not give sufficient notice of its intention to depart upward; and, finally, that the extent of the departure was unreasonable.

None of Mapp's contentions has merit. First, the Supreme Court has held that a sentencing court may rely even on *acquitted* conduct, so long as that conduct has been proved by adequate evidence. *See United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 637–38, 136 L.Ed.2d 554 (1997). *A fortiori*, then, it was within the district court's discretion to consider conduct as to which the jury was simply unable to reach a verdict. Second, despite Mapp's assertion to the contrary, the record clearly indicates that the district court gave notice well in advance of sentencing that it was considering an upward departure. And, finally, in light of the district court's findings with regard to Mapp's conduct, we believe that the extent of the upward departure was eminently reasonable.

## VI.

We have considered all of the appellants' arguments and find them to be without merit.

The judgments of the district court are affirmed in their entirety.

16. We note that, before reaching its conclusion, the district court invited defense counsel to supplement the record with any information that would support Mapp's claim that his prior convictions were factually related; defense counsel declined the invitation.